**QWEST CORPORATION,
et al., Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.**

**Metrocall, Inc., et al., Intervenors.**

**Nos. 00–1376 and 00–1377.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 9, 2001.

Decided June 15, 2001.

Michael K. Kellogg argued the cause for petitioners. With him on the briefs were Aaron M. Panner, Michael E. Glover, Edward Shakin, Joseph Dibella, Dan L. Poole, Robert B. McKenna, Jeffry A. Brueggeman, James D. Ellis, Roger K. Toppins and Hope E. Thurrott. Alfred G. Richter entered an appearance.

Richard K. Welch, Counsel, Federal Communications Commission, argued the cause for respondents. On the brief were Jane E. Mago, Acting General Counsel at the time the brief was filed, John E. Ingle, Deputy Associate General Counsel, Laurel R. Bergold, Counsel, John M. Nannes, Deputy Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys. Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, entered an appearance.

Frederick M. Joyce, Christine McLaughlin, Ronald E. Quirk, Jr., Marianne Roach Casserly, Jonathan J. Nadler and Robert L. Hoggarth were on the brief for intervenors Metrocall, Inc., Arch Wireless, Inc. and Personal Communications Industry Association. Angela E. Giancarlo entered an appearance.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

When a local caller dials the number of a paging service customer, the caller's Local Exchange Carrier ("LEC") sends the call to a paging terminal, operated by the paging service. Once the terminal validates the call and receives the "call-back" number or message, it sends out a radio broadcast that sets off the customer's pager. Thus the call starts out on the LEC's network but is handed off to the paging carrier, which completes the call. This case concerns the Federal Communications Commission's rule forbidding any LEC charge to the paging company for carrying such calls, 47 CFR § 51.703(b).

The Commission enforced this no-compensation rule through adjudication of complaints brought by providers of one-way paging services, who contended that certain LECs had violated § 51.703(b). The LECs object to use of this procedure to resolve the dispute. They contend that under the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (the "1996 Act"), such disputes can be resolved only through state-managed negotiation and arbitration under 47 U.S.C. §§ 251(c)(1), 252. But another court has already resolved against these very LECs an underlying issue that is vital to their claim. In *Iowa Utilities Bd. v. FCC*, 120 F.3d 753 (8th Cir.1997), *aff'd in part and rev'd in part sub nom., AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999), the Eighth Circuit rejected the LECs' claim that 47 CFR § 51.703(b) was wholly *ultra vires*. Rather, the court found that, as applied to Commercial Mobile Radio Service ("CMRS"), which includes paging, the regulation was validly grounded in 47 U.S.C. § 332, a provision adopted well before the 1996 Act, in the 1982 amendments to the Communications Act of 1934. See Communications Amendments Act of 1982, Pub.L. No. 97–259, § 331, 96 Stat. 1087, 1096–97. The Eighth Circuit's decision meets the criteria for issue preclusion. Petitioners are therefore bound by its holding that the validity of 47 CFR

§ 51.703(b) (as applied to CMRS) is wholly independent of the 1996 Act. The LECs themselves do not contend that a rule so grounded may be enforced solely through the negotiation and arbitration procedures of the 1996 Act. Accordingly we uphold the Commission's use of its complaint procedure. We also affirm the Commission's substantive interpretation of § 51.703(b) as barring charges for facilities used to deliver LEC-originated traffic.

\* \* \*

The Commission promulgated § 51.703(b) in its first major order implementing the 1996 Act. See *In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 F.C.C.R. 15,499, 16,228, 1996 WL 452885 (1996) (*"Local Competition Order"*). The rule states:

> A LEC may not assess charges on any other telecommunications carrier for local telecommunications traffic that originates on the LEC's network.

47 CFR § 51.703(b); see also *Local Competition Order*, 11 F.C.C.R. at 16,016 ¶ 1042. In resolving a broad challenge to that order, the Eighth Circuit upheld § 51.703(b) as applied to CMRS providers, *Iowa Utilities Bd.*, 120 F.3d at 800 n. 21; the LECs did not petition for certiorari on that issue.

After the Eighth Circuit's decision the FCC's Common Carrier Bureau ruled that § 51.703(b)'s bar on LEC charges for completion of LEC-originated calls also covered charges for certain facilities used by LECs to provide such services. In response to a request for clarification from several LECs, the then chief of the Common Carrier Bureau, A. Richard Metzger, Jr., issued a letter saying that the LECs could not charge paging service providers for the cost of "LEC transmission facilities that are used on a dedicated basis to deliver to paging service providers local telecommunications traffic that originates on

the LEC's network." Metzger Letter of December 30, 1997, 13 F.C.C.R. 184, 184 (1997). The LECs filed applications for review of the letter; three years later, the Commission has yet to rule on the matter.

Shortly before and after the release of the Metzger letter, one-way paging providers TSR Wireless, LLC and Metrocall, Inc. filed a series of complaints with the Commission under 47 U.S.C. § 208 (authorizing complaints "of anything done or omitted to be done by any common carrier subject to this chapter, in contravention of the provisions thereof"). The complaints claimed (in the aggregate) that the four LECs now petitioning for review had charged for facilities used to deliver LEC-originated traffic, in violation, as the paging companies saw it, of § 51.703(b). TSR Wireless also challenged Qwest's refusal to provide a "T–1 circuit" to handle paging traffic between Yuma and Flagstaff, Arizona. The LECs argued that the Commission lacked jurisdiction to adjudicate the complaints, on the theory that the carriers could enforce the LECs' interconnection obligations only through the 1996 Act's negotiation and arbitration provisions. See 47 U.S.C. §§ 251(c)(1), 252.

The Commission held that it had jurisdiction to resolve the paging carriers' complaints. Although relying primarily on a different interpretation of the 1996 Act from the LECs', it also invoked 47 U.S.C. § 332, the provision that had won the day for the Commission in the Eighth Circuit. *TSR Wireless, LLC v. US WEST Communications, Inc.*, 15 F.C.C.R. 11,166, 11,172, 11,172–73 n. 42, 11,189–90 ¶¶ 13, 41–42, 2000 WL 796763 (2000) (*"Order"*). On the merits the Commission concluded that § 51.703(b) prevented the LECs from imposing charges for the facilities used to deliver LEC-originated traffic to the paging carriers. It also held (subject to a qualification) that Qwest was required to

meet TSR Wireless's request for a T–1 line between Yuma and Flagstaff, Arizona at its own expense. *Id.* at 11,189 ¶ 40.

\* \* \*

The parties' dispute over the propriety of CMRS providers enforcing § 51.703(b) via the Commission's § 208 complaint procedure entails two steps—steps that the Commission collapses into one in its somewhat confusing issue preclusion argument. The first step is to identify *the source* of the Commission's authority to adopt § 51.703(b) insofar as it applies to CMRS. (The LECs here do *not* challenge the substantive validity of § 51.703(b) as applied to CMRS.) The second step is to determine whether adversely affected parties may pursue relief for non-compliance only via the 1996 Act's negotiation and arbitration provisions, see 47 U.S.C. §§ 251(c)(1), 252, or whether they may get relief via complaints to the Commission under 47 U.S.C. § 208.

The link between the two is that if § 51.703(b) (as applied to CMRS) rests solely on the 1996 Act, the second question, that of available remedy, is sharply contested. But if § 51.703(b) (as applied to CMRS) is validated by prior legislation, specifically 47 U.S.C. § 332, then 47 U.S.C. § 208 is indisputably available. Perhaps because the second step (the proper channels of enforcement) is so easy on the second hypothesis (47 U.S.C. § 332), the Commission tends to overlook it. By coincidence, the Eighth Circuit decision addressed the issues of both substantive power and remedy.

In the Eighth Circuit litigation the LECs challenged the substantive validity of § 51.703(b) and many other provisions of the *Local Competition Order.* That order in fact rested on the 1996 Act, and for many contexts the court found the regulations adopted invalid. But insofar as § 51.703(b) and several kindred sections applied to CMRS, the court found support in 47 U.S.C. § 332:

> Because Congress expressly amended section 2(b) to preclude state regulation of entry of and rates charged by Commercial Mobile Radio Service (CMRS) providers, see 47 U.S.C. §§ 152(b) (exempting the provisions of section 332), 332(c)(3)(A), and *because section 332(c)(1)(B) gives the FCC the authority to order LECs to interconnect with CMRS carriers,* we believe that the Commission has the authority to issue the rules of special concern to the CMRS providers, i.e., 47 C.F.R. §§ 51.701, 51.703, 51.709(b), 51.711(a)(1), 51.715(d), and 51.717, but only as these provisions apply to CMRS providers. Thus, rules 51.701, 51.703, 51.709(b), 51.711(a)(1), 51.715(d), and 51.717 remain in full force and effect with respect to the CMRS providers, and our order of vacation does not apply to them in the CMRS context.

*Iowa Utilities Bd.*, 120 F.3d at 800 n. 21 (emphasis added).[1] In the *Local Competition Order* itself, interestingly, the Commission had not invoked § 332 in support of the regulation. See 11 F.C.C.R. at 16,005–06 ¶ ¶ 1023, 1025. Compare *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

The LECs also raised the remedial issue presented here (though in a much broader version), persuading the court that the Commission could not use § 208 complaint

---

1. Section 332(c)(1)(B) provides: "Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request, this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter."

proceedings to enforce the whole family of duties to which § 51.703(b) (as it applied generally) belonged. On this they won. *Iowa Utilities Bd.*, 120 F.3d at 803–04. But the victory was short-lived; the Supreme Court vacated the ruling as unripe. *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. at 386, 119 S.Ct. 721.

■ The Eighth Circuit's substantive ruling that § 51.703(b) was validly grounded in § 332 seems on its face to meet the criteria for issue preclusion. Under that doctrine, judgment in a prior suit can preclude relitigation of an issue actually litigated and necessary to the outcome of the first action so long as no unfairness results. See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 197 (D.C.Cir.1996); see also *Southern Pac. R.R. Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 42 L.Ed. 355 (1897).

■ The LECs' strongest response is that *Iowa Utilities Bd.* did not really find that § 332 was the statutory authority for § 51.703(b). The court's use of § 332, they say, was only to parry a claim that § 51.703(b) and many associated regulations were invalid intrusions on state authority under § 2(b) of the Communications Act of 1934, 47 U.S.C. § 152(b). But this cuts the *Iowa Utilities Bd.* decision too fine. The LECs' basic attack was that the 1996 Act failed to support § 51.703(b) and the associated regulations. The Eighth Circuit by and large agreed (though the Supreme Court did not). But having agreed on the general proposition, the Eighth Circuit was convinced that an exception applied for CMRS, as to which it plainly found an independent basis of support *outside* the 1996 Act, in § 332.

The petitioners did not seek certiorari as to the Eighth Circuit's holding on § 332—making it a final judgment with preclusive effects. The Supreme Court, discussing the preclusive effect of a judgment that the loser was *entitled to appeal* to the Supreme Court, has held that the loser's failure to do so left him as badly off as if he had appealed and lost. *Angel v. Bullington*, 330 U.S. 183, 189, 67 S.Ct. 657, 91 L.Ed. 832 (1947). As a general matter we cannot see that certiorari should be on a different footing. Of course the odds are against such relief; most litigants will not have it granted even if they do seek it. Yet the judgments of intermediate federal appellate courts nonetheless have issue preclusive effect. See *Johnson Steel Street Rail Co. v. William Wharton, Jr. & Co.*, 152 U.S. 252, 261, 14 S.Ct. 608, 38 L.Ed. 429 (1894).

The LECs go on to argue that theirs is a special case—they "had no motivation to challenge section 51.703(b)" because they reasonably thought the rule applied only to traffic (for which they say they never charged); the FCC only later revealed its view that the rule embraced charges for facilities. See Petitioners' Br. at 38–39. But this seems somewhat disingenuous on two counts. First, so far as appears they *did* contest the rule in the Eighth Circuit. Indeed, they evidently did so in the specific context of CMRS (at least footnote 21 gives no hint that it sprang out of the blue, and the LECs make no claim that it did). Second, the Eighth Circuit disposed of rehearing petitions in *Iowa Utilities Bd.* on October 14, 1997, so that the 90–day period for filing a petition for a writ of certiorari, see S.Ct. R. 13, only closed well after the December 30, 1997 Metzger letter clearly put the LECs on notice of the rule's application to facilities. In any event, and recognizing that litigants must be highly selective in framing petitions for certiorari, we cannot see any serious unfairness in giving preclusive effect to the judgment of a sister circuit.

Petitioners also invoke the doctrine launched in *Functional Music, Inc. v. FCC*, 274 F.2d 543 (D.C.Cir.1958). But that doctrine has no bearing on issue preclusion, as it relates simply to a party's right, once it has passed up a chance to bring suit attacking a rule, to resist its later application. *Public Citizen v. Nuclear Regulatory Commission*, 901 F.2d 147, 153 n. 3 (D.C.Cir.1990); *Western Coal Traffic League v. Interstate Commerce Commission*, 735 F.2d 1408, 1411 (D.C.Cir. 1984).

Petitioners' procedural victory, the Eighth Circuit's holding that the Commission could not use complaint proceedings to enforce the LECs' 47 U.S.C. §§ 251–252 obligations, is also of no use to them. Because of the Supreme Court's authoritative ruling that the issue was unripe, *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. at 386, 119 S.Ct. 721, the Commission cannot be bound by its loss, and petitioners cannot (contrary to the Commission's rather bizarre effort to deploy claim preclusion) be bound by their failure to pose the procedural issue in the CMRS context in the Eighth Circuit. See *Norfolk & Western Ry. Co. v. United States*, 768 F.2d 373, 377–78 (D.C.Cir.1985).

Petitioners acknowledge that the Commission referred to § 332 in the *Order*, but stress, in a footnote, that the references were tucked away in a diminutive footnote and in the ordering clauses. See *Order*, 15 F.C.C.R. at 11,172–73 n. 42, 11,189–90 ¶ ¶ 41–42. Petitioners' footnoted claim that under *McElroy Electronics Corp. v. FCC*, 990 F.2d 1351 (D.C.Cir.1993), a footnote will not suffice, is incorrect. There we held that an *ambiguous* footnote in a Commission order failed to provide adequate notice, *id.* at 1361–62, but here the footnote, though small, is not obscure.

\*    \*    \*

█ The Commission makes no claim that *Iowa Utilities Bd.* bars petitioners'

attack on its conclusion that § 51.703(b) prohibits charges for facilities as well as traffic. We review the Commission's reading of its regulation under highly deferential standards, and would reverse only a clear misinterpretation. See, e.g., *National Medical Enterprises, Inc. v. Shalala*, 43 F.3d 691, 697 (D.C.Cir.1995).

Petitioners argue that the Commission's inclusive reading is unreasonable and "contrary to the plain language of the FCC's regulation." See Petitioners' Br. at 43. We see no barrier in the plain language. As to reasonableness, the Commission's explanation seems compelling; its interpretation prevents LECs from "re-designating the 'traffic' charges as 'facilities' charges." *Order*, 15 F.C.C.R. at 11,181 ¶ 25. The opposite reading would create an apparently artificial distinction, giving LECs an incentive to game the system by providing dedicated facilities at the paging providers' expense in cases where they could conveniently carry the traffic at their own expense.

Petitioners suggest that 47 CFR § 51.709(b) contradicts the Commission's ruling. That section provides:

> The rate of a carrier providing transmission facilities dedicated to the transmission of traffic between two carriers' networks shall recover only the costs of the proportion of that trunk capacity used by an interconnecting carrier to send traffic that will terminate on the providing carrier's network. Such proportions may be measured during peak periods.

That the regulation mentions facilities, while § 51.703(b) does not, is surely not enough to establish the principle that when the Commission wants to target charges for facilities, it must do so explicitly. Moreover, as we do not understand the LECs to claim that the traffic in question "terminate[s] on the providing carrier's network," we do not see how the regula-

tion assists them. The Commission reads § 51.709(b) as entirely congruent with § 51.703(b), confirming the ban on charges, whether labeled as for traffic or for facilities, for LEC-originated local calls. See *Order*, 15 F.C.C.R. at 11,181–82 ¶ 26. The present case does not call on us to pass on the Commission's reading of § 51.709(b), but we can say that the provision does not seem to pose the contradiction claimed by petitioners.

Finally, the petitioners say they reasonably fear that the paging carriers will use the Commission's interpretation to demand unnecessary and expensive facilities. But they have not by any means established that such "gold-plating" is likely. There are three uses of facilities—so far as appears not uncommon—for which the paging carriers themselves must pay: (1) for "transiting traffic"—"traffic that originates from a carrier other than the interconnecting LEC but nonetheless is carried over the LEC network to the paging carrier's network," *Order*, 15 F.C.C.R. at 11,177 n. 70; (2) for connecting parts of a paging carrier's own network, such as those linking a paging terminal with its antennas, *id.*; and (3) for delivering traffic that originates or terminates outside the Major Trading Area (essentially the local calling area), *id.* at 11,184 n. 102. As a result of these three facility uses, paging services that insisted on gold-plating would run up their own costs. Further, the Commission observes that LECs can ask the Commission for a waiver of § 51.703. Commission Br. at 45 n.92. The suggestion seems to reflect a view that paging carriers' efforts at gold-plating would be unreasonable, and thus that the Commission would afford relief on a proper record. We cannot assume the contrary. In the absence of gold-plating, the Commission's order simply requires the LECs to look to their own customers to recoup the needed costs of their facilities.

The LECs' petitions are

*Denied.*