**LEVEL 3 COMMUNICATIONS, LLC, a Delaware limited liability company, Plaintiff,**

**v.**

**PUBLIC UTILITIES COMMISSION OF COLORADO, et al., Defendants.**

**No. CIV.A.01–N–2455(CBS).**

United States District Court, D. Colorado.

Dec. 8, 2003.

---

Rogelio E. Peña, Esq., Peña & Associates, Boulder, for Plaintiff.

Greg Rogers, Esq., Director—State Regulatory Affairs, Level 3 Communications, LLC, Broomfield, for Plaintiff.

Winslow B. Waxter, Esq., Qwest Services Corporation, Denver, for Defendant Qwest Corporation.

Andrew R. Newell, Esq., Nichols & Associates, Boulder, for Plaintiff.

Stephen E. Abrams, Esq., Perkins Coie, LLP, Denver, for Defendant Qwest Corporation.

John M. Devaney, Esq., Kelly A. Cameron, Esq., Perkins Coie, LLP, Washington, D.C., for Defendant Qwest Corporation.

David M. Nocera, Esq., Michael J. Santisi, Esq., Assistant Attorneys General, Business and Licensing Section, for Defendants Colorado Public Utilities Commission, Raymond L. Gifford, Polly Page, and Jim Dyer.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a judicial review of an agency decision. Plaintiff, Level 3 Communications, LLC ("Level 3"), alleges that the defendant, Public Utilities Commission of Colorado ("CPUC"), erred in its decision that internet-bound telephone traffic should not be included as "originating" traffic in allocating costs of such traffic between Level 3 and Defendant, Qwest Corporation ("Qwest"). This matter is before the Court on (1) "Defendant Qwest Corporation's Cross–Motion for Summary Judgment," filed September 13, 2002, (2) "State Defendants' Motion for Summary Judgment," filed September 13, 2002, and (3) "Plaintiff's Motion for Summary Judgment," filed September 13, 2002. Jurisdiction is based upon 47 U.S.C.A. § 252(e)(6)

(West 2001 & Supp.2003), and 28 U.S.C.A. § 1331 (West 1993 & Supp.2003).

## FACTS

The Telecommunications Act of 1996 (the "Act"), 47 U.S.C.A. §§ 251–276, makes former monopoly telephone companies "subject to a host of duties intended to facilitate market entry. Foremost among these duties is the [carrier's] obligation ... to share its network with competitors." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 726, 142 L.Ed.2d 835 (1999). The Act requires telecommunications carriers to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers. 47 U.S.C.A. § 251(a)(1) (West 2001 & Supp.2003). Specifically, the Act sets forth a system by which a competitive local exchange carrier ("CLEC") can negotiate and enter into a binding agreement for interconnection with an incumbent local exchange carrier ("ILEC"), the former monopoly telephone company. 47 U.S.C.A. § 252(a).

Level 3 is a CLEC, and Qwest is an ILEC under the terms of the Act. (Mot. to Supplement Defs.' Joint Statement of Undisputed Material Facts ¶¶ 1–2 [filed Sept. 12, 2002] [hereinafter "Supp. Facts"].) [1] Level 3 and Qwest entered into negotiations to interconnect their networks under an interconnection agreement. (Def. Qwest Corp.'s Br. in Supp. of its Cross–Mot. for Summ. J. at 6 [filed Sept. 13, 2002] [hereinafter "Qwest's Br."]; Admin. R. at 1, 3 [filed June 14, 2002] [hereinafter "Admin. R."].) [2] These negotiations left several unresolved issues. (*Id.*) If there are any unresolved issues over the terms of an interconnection agreement, any party in the negotiations may petition the relevant state commission to arbitrate these unresolved terms. 47 U.S.C.A. § 252(b); *AT&T*, 525 U.S. at 371, 119 S.Ct. at 726. The determination of the relevant state commission is incorporated into the final interconnection agreement. 47 U.S.C.A.

---

1. The parties agreed, and I ordered, stipulated statements of undisputed facts on or before August 22, 2002. (Scheduling Order [filed Aug. 6, 2002].) Qwest and CPUC filed a joint statement of undisputed facts on August 22, 2000. (Joint Statement of Undisputed Material Facts [filed Aug. 22, 2002] [hereinafter "Joint Facts"].) The record does not show that Level 3 ever disputed any of these facts, beyond the supplemental facts they set forth, as discussed below. On the same day, Level 3 filed a motion for extension of time to file a stipulated statement of undisputed facts, which I granted. (Mot. for Extension of Time to File Stipulated Statement of Undisputed Facts [filed Aug. 22, 2002]; Minute Order [filed Mar. 11, 2003].) On September 12, 2002, Level 3 filed its supplement to the Qwest and CPUC's joint statement of facts. (Supp.Facts.) The record does not show that CPUC ever disputed any of these facts. Qwest does not dispute any of the facts set forth by Level 3 that are relevant to this Order and Memorandum of Decision. (Def. Qwest Corp.'s Resp. Br. in Opp'n to Level 3' Mot. for Summ. J. at 6–7 [filed Oct. 11, 2002] [herein-

after "Qwest's Resp."].) In light of the foregoing, all relevant facts alleged are deemed admitted by all the parties.

2. The parties fail to place this fact, as well as many others, in their statements of undisputed material fact. All three parties flagrantly disregard my procedures, which state that "the movant shall set forth in simple, declarative sentences, *separately numbered and paragraphed,* each material fact which the movant believes is not in dispute and which supports movant's claim that movant is entitled to judgment as a matter of law[, and that e]ach separately numbered and paragraphed fact *must* be accompanied by a specific reference to material in the record which establishes that fact." (See Practice Standards—Civil, Special Instructions Concerning Motions for Summary Judgment [emphasis in original].) The parties' motions are peppered with facts, which each of the parties obviously consider necessary to a resolution of the motions in their favor, yet not contained in their respective filings of undisputed facts.

§ 252(b)(4)(C). Here, the relevant state commission is CPUC.[3] On October 21, 2000, Level 3 filed such a petition with CPUC. (Joint Facts ¶ 1.)

A series of administrative reviews occurred regarding the unresolved issues. (*Id.* ¶¶ 2–11.) CPUC issued two decisions during these administrative reviews that are relevant to the issues in the parties' summary judgment motions. First, CPUC issued an "Initial Commission Decision" on March 16, 2001. (Admin. R. at 524–66.) Second, CPUC issued a decision on an application for rehearing, reargument, or reconsideration ("RRR") on May 1, 2001. (*Id.* at 756–66.)

In this court, Level 3 initially challenged two parts of these decisions by CPUC—referred to as Issue 2, and Issue 6 in CPUC's proceedings. (Compl. [filed Dec. 19, 2001] [hereinafter "Compl."].) Issue 2 is no longer in dispute, so I need only fully address Issue 6. (Stipulation of the Parties to Dismiss a Claim [filed Feb. 12, 2003] [hereinafter "Stipulation"].)

Issue 6 involved "whether Internet-related traffic should be included in calculating each party's responsibility for originating traffic over its own network." (Admin. R. at 554–55.) As background: when a telephone customer places a telephone call, the call will first go through the originating carrier's network. *See e.g. Wisconsin Bell, Inc. v. Bie,* 216 F.Supp.2d 873, 876 (W.D.Wis.2002) ("if a customer of carrier A calls a customer of carrier B, the call originates on carrier A's equipment but terminates on carrier B's equipment"). The originating carrier in this dispute is Qwest. (Qwest's Br. at 6; Mem. in Supp. of Mot. for Summ. J. at 4–5 [filed Sept. 13, 2002] [hereinafter "Level 3's Br."]; Qwest's Resp. at 17.) The call is completed ("terminated") on, what is called, the terminating carrier's network. *See Wisconsin Bell,* 216 F.Supp.2d at 876; 47 C.F.R. § 51.701(d) (2003). If the call both originates and terminates on the Qwest network—i.e. one Qwest customer calling another Qwest customer—Qwest is, for the purposes here, responsible for the entire cost of the call.

If the call is to be terminated, not with a Qwest customer, but with a customer of another entity (here, Level 3) the call must switch from Qwest's network to Level 3's network. For the call to switch from one network to the other, it must go through trunk and interconnection facilities. (Level 3's Br. at 5; Qwest's Br. at 27.) Trunks are cables, often "high capacity copper or fiberoptic cables[,] ... which connect the parties' networks so that traffic can be exchanged" between them. *Intermedia Communications, Inc. v. Bellsouth Telecommunications, Inc.,* 173 F.Supp.2d 1282, 1283 (M.D.Fla.2000). The point where the call switches between networks is called the point of interconnection. *See e.g. Iowa Network Services, Inc. v. Qwest Corp.,* No. 4:02–cv–40156, 2002 WL 31296324, at *2 (S.D.Iowa, Oct.9 2002).

The broad issue, in the case at hand, is whether Qwest is entirely responsible for the costs of the portion of a call originating on Qwest's networks before the call gets to the point of interconnection, or if Level 3 must share some of this cost. (Admin. R. at 554–55; Level 3's Br. at 5; State Defs.' Mem. Br. in Supp. of Mot. for Summ. J. at 11 [filed Sept. 13, 2002] [hereinafter "CPUC's Br."].) Level 3 and Qwest agree that as a general proposition, the financial responsibility for trunks and facilities should be apportioned between them on the basis of each company's originating traffic flowing over these trunks. (*Id.* at

---

**3.** All references herein to CPUC include, when relevant, defendants Raymond L. Gifford, in his official capacity as Chairman of CPUC, Polly Page, in her official capacity as Commissioner of CPUC, and Jim Dyer, in his official capacity as Commissioner of CPUC.

555.) Apparently, virtually all traffic originates from Qwest, because it is Qwest, through whom most telephone customers place their calls. (Qwest's Resp. at 17; Level 3's Br. at 4–5.) Thus, Qwest would normally be responsible for the predominant costs of this telephone traffic.

The CPUC has effectively created an exception to this general rule, and that exception has produced this litigation. According to CPUC's determination, a telephone call which originates on Qwest's network but terminates with an internet service provider ("ISP") who is a customer of Level 3 would not be considered in allocating financial responsibility for the trunk. (Admin. R. at 559, 761–63.)[4] In other words, if 95% of calls originate from Qwest's network, Qwest would normally be responsible for 95% of the cost up to the point of interconnection on the relevant trunk. (Admin. R. at 556.) However, if 95% of these calls originate from Qwest's network, but are all terminated with ISPs on Level 3's network, Level 3 would be responsible for 100% of the costs of the relevant trunks. (*Id.* at 556, 559.)

CPUC, in its initial decision, explained its policy rationale for this conclusion by stating that:

[t]he logic underlying our decision on reciprocal compensation for Internet bound traffic dictates a similar result here.[5] When connecting to an ISP served by a CLEC, the ILEC end-user acts primarily as the customer of the

ISP, not as the customer of the ILEC. The end-user should pay the ISP; the ISP should charge the cost-causing end-user. The ISP should compensate both the ILEC (Qwest) and the CLEC (Level 3) for costs incurred in originating and transportation the ISP-bound call. Therefore, we agree with Qwest that Internet related traffic should be excluded when determining relative use of entrance facilities and direct trunked transport.

(Admin. R. at 559 [footnote added].) In CPUC's Decision on Application for Rehearing, Reargument, or Reconsideration, CPUC stated that its reliance on the logic of reciprocal compensation "was not improper[ ]." (*Id.* at 762–63.) CPUC's "logic" behind "reciprocal compensation," beyond the reasoning set forth above, includes CPUC's goals to eliminate economic distortions and unintended arbitrage opportunities. (*Id.* at 538, 541, 544, 559.)

CPUC's distinction between internet-related traffic, and other traffic, is critical to the parties because Level 3 has an exclusive focus on serving ISPs. (*Id.* at 557.) Thus, since Level 3 exclusively serves ISPs, and virtually all calls originate with Qwest, Level 3 will be responsible for the costs of the relevant trunks and relevant interconnection facilities if Qwest prevails on this issue. Level 3, consequently, contests CPUC's determination.

---

**4.** "ISPs are entities that allow their customers access to the internet. Such a customer, an 'end user' of the telephone system, will use a computer and modem to place a call to the ISP server in his local calling area. He will usually pay a flat monthly fee to the ISP (above the flat fee already paid to his LEC [Local Exchange Carrier] for use of the local exchange network). The ISP typically purchases business lines from a LEC, for which it pays a flat monthly fee that allows unlimited incoming calls." *Bell Atlantic Tel. Cos. v.*

*F.C.C.,* 206 F.3d 1, 4 (D.C.Cir.2000) (citation omitted; internal quotation marks omitted).

**5.** CPUC's decision on reciprocal compensation for Internet bound traffic was Issue 2. Issue 2, which is no longer in dispute, dealt with CPUC's determination to use what is called a "bill and keep" compensation mechanism, as opposed to a "reciprocal compensation" mechanism, to apply to the transportation and termination (completion of the call) of traffic on the terminating carriers' network. (*Id.* at 529–30.)

On December 19, 2001, Level 3 filed a complaint with this court challenging CPUC's decision on Issue 2 and Issue 6. (Compl.) On September 13, 2002, all parties filed motions for summary judgment. (Def. Qwest Corp.'s Cross–Mot. for Summ. J. [filed Sept. 13, 2002]; State Defs.' Mot. for Summ. J. [filed Sept. 13, 2002]; Pl.'s Mot. for Summ. J. [filed Sept. 13, 2002].) On February 12, 2003, the parties stipulated to dismiss with prejudice Level 3's first claim in its Complaint, referred to as "Issue 2" in the CPUC proceedings. (Stipulation.)

## ANALYSIS

### 1. Jurisdiction and Standard of Review

47 U.S.C.A. § 252(e)(6) provides that when a "[s]tate commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate [f]ederal district court to determine whether the agreement or statement meets the requirements of section 251 of this title and this section." I must consider *de novo* whether the interconnection agreement complies with the Act and the implementing regulations. *Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.*, 235 F.3d 493, 498 (10th Cir.2000); *US West Communications, Inc. v. Hix*, 986 F.Supp. 13, 19 (D.Colo.1997). I must review all other issues under an arbitrary and capricious standard. *Id.* Further, I must defer to the Federal Communication Commission's ("FCC") regulations. *See, e.g., US West Communications, Inc. v. Hix*, 57 F.Supp.2d 1112, 1117 (D.Colo.1999).

Pursuant to rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e). " 'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.' " *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 531 (10th Cir.1998) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2505). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 [10th Cir.1990] ).

### 2. Parties' Arguments

The parties set forth various arguments in each of their motions for summary judgment. Qwest argues that (1) 47 C.F.R. § 51.709(b) requires the exclusion of inter-

net traffic from the relative use calculations, and that this rule is binding on the court, and (2) even if 47 C.F.R. § 51.709(b) is not binding, CPUC's exclusion of internet traffic from the calculation is lawful. (Qwest's Br. at 25–29.) CPUC argues that its decision to exclude internet traffic from the relative use calculations is both lawful and consistent with applicable FCC precedent and rules. (CPUC's Br. at 11–14.) Specifically, CPUC argued that (1) it did not rely on the *FCC's Remand Order*, discussed below, in its decision, (2) it correctly disregarded the case of *TSR Wireless*, discussed below, and (3) it did not violate CPUC Rule 3.5. (*Id.*) Level 3 argues that (1) CPUC erred by not applying 47 C.F.R. § 51.703(b), 47 C.F.R. § 51.709(b), and certain case law to its determination, and (2) CPUC erred by applying the logic of a bill-and-keep mechanism (Issue 2) to its determination of relative use (Issue 6). (Level 3's Br. at 4–7, 12–16, 23–26.)

The various arguments made by the parties can be boiled down into three parts. First, the parties disagree whether 47 C.F.R. § 51.703(b) and case law regarding 47 C.F.R. § 51.703(b), apply to this case and control the result. Second, the parties disagree whether 47 C.F.R. § 51.709(b) applies to this case, and controls the result. Finally, the parties dispute the policy rationales behind CPUC's decision. I will address each issue, in turn.

### a. 47 C.F.R. § 51.703(b)

Level 3 sets forth a relatively simple argument explaining why CPUC erred. (Level 3's Br. at 13–15.) Level 3 asserts that 47 C.F.R. § 51.703(b) is the governing regulatory rule, and mandates that Qwest may not charge Level 3 for the costs of the trunks and facilities up to the point of interconnection. (*Id.*) 47 C.F.R. § 51.703(b) provides that an "LEC [Qwest,] may not assess charges on any other telecommunications carrier [Level 3]

for telecommunications traffic that originates on the LEC's network." (2003). The plain language of this rule demonstrates that if the traffic at issue is "telecommunications traffic," Level 3 must prevail. "Telecommunications traffic" is "traffic exchanged between a[n] LEC and a telecommunications carrier other than a CMRS provider, *except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access.*" 47 C.F.R. § 51.701(b)(1) (2003) (emphasis added).

There is an old version of this rule, with slightly different language. However, all the parties acknowledge and agree that if 47 C.F.R. § 51.703(b) applies, it is the new version of the rule, not the old version, that governs. (Level 3's Br. at 13; Pl.'s Resp. to Cross–Mots. for Summ. J. at 9 [filed Oct. 11, 2002] [hereinafter "Level 3's Resp."]; Qwest's Resp. at 24; State Defs.' Reply Br. in Supp. of Mot. for Summ. J. at 2 [filed Oct. 25, 2002].) In determining whether 47 C.F.R. § 51.703(b) applies to this case, I must look to the new 47 C.F.R. § 51.703(b), as opposed to its old version. *See U.S. West Communications, Inc. v. Jennings*, 304 F.3d 950, 956 (9th Cir.2002) (holding that "the interconnection agreements [must] comply with current FCC regulations, regardless of whether those regulations were in effect when the ACC [Arizona's version of CPUC] approved the agreements").

Level 3 will prevail if 47 C.F.R. § 51.703(b) applies to the issue at hand. The question, therefore, is whether the traffic at issue "is interstate or intrastate exchange access, information access, or exchange services for such access." If it is, then 47 C.F.R. § 51.703(b) does not apply, and Level 3's argument is without merit. The FCC has found that ISP traffic is "information access." *In re Implementa-*

*tion of Local Competition Provisions in Telecomms. Act of 1996,* 16 F.C.C.R. 9151, 9170 (hereinafter *"ISP Remand Order"*) (finding that "ISP-bound traffic falls under the rubric of 'information access' "); *see also Global Naps, Inc. v. New England Tel. & Tel. Co.,* 226 F.Supp.2d 279, 291 (D.Mass.2002) ("the FCC now views ISP-bound telephone traffic as 'information access' traffic"). Further, the *ISP Remand Order* suggests that ISP-bound traffic would also be considered "interstate ... exchange access" because ISP-bound traffic is "interstate ... access." *ISP Remand Order,* 16 F.C.C.R. at 9153 ("traffic delivered to an ISP is predominantly interstate access traffic"). The *ISP Remand Order,* though, does not directly conclude that ISP-bound traffic is "interstate ... exchange access," noting that whether ISP-bound "traffic falls under the category of 'exchange access'—[is] an issue pending before the D.C. Circuit in a separate proceeding." *ISP Remand Order,* 16 F.C.C.R. at 9170–71. I have failed to uncover any ruling in this separate proceeding.[6]

■ The *ISP Remand Order's* conclusion that ISP-bound traffic is "information access" traffic is still good law. Contrary to Level 3's argument, the case of *WorldCom, Inc. v. F.C.C.* does not overrule the FCC's determination that ISP-bound traffic is "information access," or may be "interstate ... exchange access." *WorldCom, Inc. v. F.C.C.,* 288 F.3d 429, 434 (D.C.Cir.2002). Rather, *WorldCom* remands the FCC's determination regarding ISP-bound traffic on a different ground, that 47 U.S.C.A. § 251(g) does not provide authority for the FCC to not apply 47 U.S.C.A. § 251(b)(5), the reciprocal compensation rule. *Id.* In other words, *WorldCom* remanded the *FCC Remand Order* on

the basis that 47 U.S.C.A. § 251(g) does not provide the statutory authority that the FCC claims it does regarding reciprocal compensation. *Id.,* 288 F.3d 429. This is not the same as remanding on the basis that information access does not refer to ISP-bound traffic. *Id.* Since the issue is not reciprocal compensation, and *WorldCom* did not change the definition of "information access," *WorldCom* has not undermined the fact that the FCC properly treats ISP-bound traffic as "information access." *Id.* Since *WorldCom,* moreover, did not vacate the *FCC Remand Order,* the *FCC Remand Order* is still in effect. *Pacific Bell v. Pac W. Telecomm., Inc.,* 325 F.3d 1114, 1122–23 (9th Cir.2003). Further, the only other court to deal with this question since *WorldCom,* explained in dicta that ISP-bound traffic is "information access" traffic, despite *WorldCom. Global Naps,* 226 F.Supp.2d at 291 (D.Mass.2002) (acknowledging the *WorldCom* case while stating that "the FCC now views ISP-bound telephone traffic as 'information access' traffic"). Therefore, since ISP-bound traffic is not "telecommunications traffic," 47 C.F.R. § 51.703(b) does not require Qwest to "assess charges ... for traffic that originates on the LEC's [Qwest's] network." 47 C.F.R. § 51.703(b).

Level 3 also cites two decisions for the proposition that 47 C.F.R. § 51.703(b) controls the outcome in favor of Level 3. (Level 3's Br. at 13–16, 24.) These cases are *TSR Wireless, LLC v. U.S. West Communications, Inc.,* 15 F.C.C.R. 11166, 11184 (June 21, 2000), *aff'd sub. nom. Qwest Corp. v. FCC,* 252 F.3d 462 (D.C.Cir.2001), and *In the Matter of Petition of WorldCom, Inc. Pursuant to Section 252(e)(5) of the Communications Act for Preemption of the Jurisdiction of the*

---

6. The parties provide no guidance on this point and barely even recognize the precise

holding of the *ISP Remand Order.*

*Va. State Corp. Comm'n Regarding Interconnection Disputes,* 17 F.C.C.R. 27039 (July 17, 2002) ("*In re WorldCom*"). *In re WorldCom* does not deal with any of the issues before this court, specifically, whether ISP-bound traffic is included under 47 C.F.R. § 51.703(b), and, thus, only supports the proposition that the FCC has confirmed the validity of 47 C.F.R. § 51.703(b). *In re WorldCom*, 17 F.C.C.R. 27039.

Level 3 argues that the case of *TSR Wireless* upheld 47 C.F.R. § 51.703(b), and mandates "rules of the road" that Qwest is responsible for the costs of the trunks and facilities up to the point of interconnection. (Level 3's Br. at 14–16.) However, *TSR Wireless* dealt only with "local" traffic, in the context of paging or commercial mobile radio service carriers. *TSR Wireless,* 15 F.C.C.R. at 11184. "Local" traffic, the precursor to "telecommunications traffic" under 47 C.F.R. § 51.701(b)(1), does not include ISP-bound traffic for the reasons set forth above. Pursuant to the language of 47 C.F.R. § 51.703(b), as well as the distinguishing facts of *TSR Wireless, TSR Wireless'* "rules of the road" language, which requires that the originating carriers are responsible for the costs up to the point of interconnection, are only the "rules of the road" for "local" calls, now referred to as "telecommunications traffic." *Id.* at 11186. For the foregoing reasons, these are not the "rules of the road" for ISP-bound calls. The holding of *TSR Wireless,* therefore, is inapplicable to the case at hand.

### b. 47 C.F.R. § 51.709(b)

Qwest contends that 47 C.F.R. § 51.703(b) does not apply, but rather, this court must follow 47 C.F.R. § 51.709(b). (Qwest's Br. at 25–27; Qwest's Resp. at 15–20.) According to Qwest, 47 C.F.R. § 51.709(b) would generally apply, but because it does *not* apply here, the negative implication of 47 C.F.R. § 51.709(b) mandates a result in its favor. (*Id.*) Level 3, on the other hand, argues that 47 C.F.R. § 51.709(b) mandates a result in its favor. (Level 3's Br. at 16.) 47 C.F.R. § 51.709(b) provides that

> [t]he rate of a carrier [Qwest] providing transmission facilities dedicated to the transmission of traffic between two carriers' networks shall recover only the costs of the proportion of that trunk capacity used by an interconnecting carrier [Level 3] to send traffic that will terminate on the providing carrier's [Qwest] network.

(2003). Qwest argues that this regulation is the relevant regulation, and that it is inapplicable. (Qwest's Br. at 25–27; Qwest's Resp. at 15–20.) The plain language of 47 C.F.R. § 51.709(b) mandates that Qwest can only recover costs for its trunk capacity if the traffic is terminated on its network. 47 C.F.R. § 51.709(b). Qwest argues that the word "traffic," as used in 47 C.F.R. § 51.709(b), is "telecommunications traffic," as defined in 47 C.F.R. § 51.701(b)(1). (Qwest's Br. at 25; Qwest's Resp. at 15.) Then, applying the statutory definition of "telecommunications traffic," discussed above, Qwest argues that ISP-bound traffic is not "telecommunications traffic," and, therefore, this case does not fall under 47 C.F.R. § 51.709(b). (*Id.*) Since the traffic at issue does not fall under 47 C.F.R. § 51.709(b), Qwest reasons that this traffic must be excluded from calculations of relative use. (*Id.*)

In other words, Qwest's argument consists of four necessary steps to reach its conclusion. First, 47 C.F.R. § 51.709(b) would normally apply to the issue at hand, and require Qwest to pay for the trunks and facilities. Second, 47 C.F.R. § 51.709(b)'s reference to "traffic" means "telecommunications traffic" as defined in 47 C.F.R. § 51.701(b)(1). Third, under 47 C.F.R. § 51.701(b)(1)'s "telecommunica-

tions traffic" definition, internet-traffic is not "telecommunications traffic," and therefore, 47 C.F.R. § 51.709(b) does not apply to this issue. Fourth, if 47 C.F.R. § 51.709(b) does not apply to this issue, then the opposite result, that Qwest not pay for the trunks and facilities, must occur.

The first step is not disputed. (Qwest's Br. at 15; Pl.'s Reply to Resp. Brs. in Opp'n to Pl.'s Mot. for Summ. J. at 7 [filed Oct. 25, 2002] [hereinafter "Level 3's Reply"].) For the reasons set forth above, Qwest is correct on the third step of its argument. I must, therefore, still analyze step two and step four of Qwest's argument.

■ Regarding the second step, Qwest argues that 47 C.F.R. § 51.709(b)'s reference to "traffic" means "telecommunications traffic" as defined in 47 C.F.R. § 51.701(b)(1). (Qwest's Br. at 25; Qwest's Resp. at 15.) Naturally, Level 3 disagrees with this proposition. (Level 3's Reply at 7–8.) Qwest provides no citations or arguments, beyond brief conclusory statements, to support the proposition that "traffic" under 47 C.F.R. § 51.709(b) means "telecommunications traffic." (Qwest's Br. at 25; Qwest's Resp. at 15.) Level 3 provides no citations to support its contention that "traffic" is not "telecommunications traffic," but does argue that the FCC must have intentionally chosen the word "traffic" when drafting 47 C.F.R. § 51.709(b), and that, logically, the word "traffic" has a broader meaning then "telecommunications traffic." (Level 3's Reply at 7–8.) My own search of case law, and FCC decisions, reveals no explanation for the use of the word "traffic" as opposed to "telecommunications traffic" in 47 C.F.R. § 51.709(b). While it is a close call whether the word "traffic" in 47 C.F.R. § 51.709(b) means "telecommunications traffic," or has a broader meaning, I conclude that it must refer to "telecommunica-

tions traffic." The first part of the relevant regulations, 47 C.F.R. § 51.701(a), provides that "[t]he provisions of this subpart [which include 47 C.F.R. § 51.709(b) ] apply to reciprocal compensation for transport and termination of *telecommunications traffic* between LECs and other telecommunications carriers." 47 C.F.R. § 51.701(a) (emphasis added). In light of the fact that 47 C.F.R. § 51.709(b), therefore, can only apply to "telecommunications traffic," under 47 C.F.R. § 51.701(a), 47 C.F.R. § 51.709(b)'s reference to "traffic" must be read to mean "telecommunications traffic."

My decision is bolstered by the fact that in other contexts, the FCC has read 47 C.F.R. § 51.709(b) as congruent with 47 C.F.R. § 51.703(b). *Qwest*, 252 F.3d at 468 (stating that "[t]he Commission reads § 51.709(b) as entirely congruent with § 51.703(b)" and citing *TSR Wireless*, 15 F.C.C.R. at 11182). The fact that these provisions have been read together in other contexts supports the notion that these provisions apply to the same "traffic"— "telecommunications traffic." The first three steps of Qwest's argument, consequently, are valid.

Regarding the fourth step, Qwest argues that if 47 C.F.R. § 51.709(b) does not apply to this issue, then the opposite result, that Qwest not pay for the trunks and facilities, must occur. (Qwest's Br. at 25–26; Qwest's Resp. at 15.) Since, as discussed above, I have concluded that there is no "traffic" in the present case, there is no longer the issue of "[t]he rate of a carrier providing transmission facilities dedicated to the transmission of traffic." 47 C.F.R. § 51.709(b). 47 C.F.R. § 51.709(b), thus, is rendered inapplicable. A calculation of relative use, therefore, under 47 C.F.R. § 51.709(b) would only take into account telecommunications traffic. Since Level 3 has provided no other

statutory or regulatory scheme that suggests that CPUC's decision is in error, I must assume CPUC's decision is correct unless Level 3 demonstrates that CPUC's determination based upon policy was arbitrary and capricious.

### c. Policy Arguments

Level 3 has set forth two additional arguments. Both arguments deal with the single paragraph in CPUC's initial decision, which analyzes the issues which are now before me. This paragraph provides that

> The logic underlying our decision on reciprocal compensation for Internet bound traffic dictates a similar result here. When connecting to an ISP served by a CLEC, the ILEC end-user acts primarily as the customer of the ISP, not as the customer of the ILEC. The end-user should pay the ISP; the ISP should charge the cost-causing end-user. The ISP should compensate both the ILEC (Qwest) and the CLEC (Level 3) for costs incurred in originating and transportation the ISP-bound call. Therefore, we agree with Qwest that Internet related traffic should be excluded when determining relative use of entrance facilities and direct trunked transport.

(Admin. R. at 559.) In CPUC's Decision on Application for Rehearing, Reargument, or Reconsideration, CPUC merely stated that its reliance on the logic of reciprocal compensation "was not improper[ ]." (*Id.* at 762–63.) CPUC's "logic" behind "reciprocal compensation," beyond its reasoning as set forth above, includes CPUC's goals to eliminate economic distortions and unintended arbitrage opportunities. (*Id.* at 538, 541, 544, 559.) Responding to CPUC's decision, first, Level 3 argues in its initial brief that CPUC erred by applying the "logic" of "bill and keep" compensation mechanism, what was Issue 2 on reciprocal compensation before

CPUC, to the issue facing this court on relative use. (Level 3's Br. at 25–26.) Second, Level 3 argues in its response and reply that CPUC's reasoning for excluding ISP-bound traffic from the calculation of relative use is circular and relies on misplaced policy arguments. (Level 3's Resp. at 18–22; Level 3's Reply at 9–10 .) Although the two issues are interrelated, I will address each argument separately, in turn.

First, Level 3 argues that CPUC erred by applying the "logic" of "bill and keep mechanism" to the issue of relative use. (Level 3's Br. at 25–26.) The "bill and keep" compensation mechanism applies to the transportation and termination of traffic on the terminating carriers' network. *See MCI Telecomms. Corp. v. U.S. West Communications,* 204 F.3d 1262, 1270 (9th Cir.2000). The issue here, however, deals with compensation for traffic on the originating carriers' side of the point of interconnection. Level 3 argues, therefore, that the "logic" of CPUC's decision regarding the "bill and keep" compensation mechanism is not applicable to the relative use issue, here.

As stated above, if CPUC has met the requirements of federal and state law, I must review all other aspects of CPUC's decision under an arbitrary and capricious standard. *US West,* 986 F.Supp. at 18. For the reasons set forth above, CPUC has met the requirements of federal and state law, so I must analyze this issue under an arbitrary and capricious standard.

> Generally, an agency decision will be considered arbitrary and capricious if the agency ha[s] relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agen-

cy, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Friends of the Bow v. Thompson*, 124 F.3d 1210, 1215 (10th Cir.1997) (internal quotation marks omitted; citation omitted); *US West*, 986 F.Supp. at 18 (same).

Level 3's sole argument that this logic is incorrect is that "CPUC's logic cannot be implemented without effectively overruling the FCC's rules of the road, which require the originating carrier to be financially responsible for transporting its traffic to the POI." (Level 3's Br. at 26.) This is a legal argument, which I have already addressed and rejected, and, therefore, Level 3's argument is without merit.

Second, Level 3 argues that CPUC's reasoning for excluding ISP-bound traffic from the calculation of relative use is circular and relies on misplaced policy arguments. (Level 3's Resp. at 18–22; Level 3's Reply at 9–10.) As an initial matter, Qwest contends that this court should not address this argument, because it was not pled in Level 3's complaint. (Def. Qwest Corp.'s Reply Br. in Supp. of Its Cross–Mot. for Summ. J. at 9 [filed Oct. 25, 2002].) Level 3's policy argument, however, is a response to Qwest's argument in Qwest's motion for summary judgment, that the policy of CPUC's decision is sound. (Qwest's Br. at 27–29; Level 3's Resp. at 18–22.) Level 3's argument, thus, is properly before me, and I need not address whether Level 3 may properly raise this argument without having set it forth in its complaint.

■ Level 3's argument fails, however, because Level 3 cannot show that CPUC's determination is arbitrary and capricious. CPUC found the same logic on reciprocal compensation applies to the issue at hand. (Admin. R. at 559.) This logic was based

upon, *inter alia*, CPUC's analysis that (1) the ILEC end-user is primarily the customer of the ISP, and thus, calls to ISPs should be treated as a call through an interexchange carrier ("IXC") [7], and (2) Level 3's responsibility for much of the costs of the call eliminates economic distortions and unintended arbitrage opportunities. (Admin. R. at 538, 541, 544, 559.)

Level 3 has provided no factual record or expert opinions upon which I can rely to challenge CPUC's determination. As arguments in response, Level 3 cannot prevail on this argument unless it "demonstrate[s] a genuine issue for trial on a material matter." *Concrete Works, Inc.*, 36 F.3d at 1518 (citing *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2554). Level 3 may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed. R.Civ.P. 56(e). If Level 3 wishes to challenge the merits, as opposed to the legal conclusions, of CPUC's decision, it must set forth specific facts showing there is at least a genuine issue that CPUC's actions were arbitrary and capricious. CPUC has set forth no facts which show that CPUC's actions were arbitrary and capricious, and therefore, cannot prevent entry of judgment for Qwest.

Furthermore, an examination of the limited record before me demonstrates that CPUC's decision was not arbitrary and capricious. CPUC's explanation that ISP-bound calls should be treated as calls through an IXC is supported by the *FCC Remand Order*, which finds that "ISP service is analogous, though not identical, to long distance calling service." *FCC Remand Order*, 16 F.C.C.R. at 9179. Fur-

---

**7.** An IXC is a carrier who "offer[s] long-distance service[s]." *Tex. Office of Pub. Util.* *Counsel v. F.C.C.*, 265 F.3d 313, 317 (5th Cir.2001).

ther, regarding reciprocal compensation, the FCC wanted to

forc[e] carriers [i.e. Level 3] to look only to their ISP customers, rather than to other carriers [i.e. Qwest], for cost recovery. As a result, the rates paid by ISPs and, consequently, their customers should better reflect the costs of services to which they subscribe. Potential subscribers should receive more accurate price signals, and the market should reward efficient providers.

*FCC Remand Order,* 16 F.C.C.R. at 9184–85 (footnote omitted). There is no reason why the same cost concern is not applicable to the cost of network components on the originating side of the point of interconnection as it is on the terminating side of the point of interconnection. Consequently, it is not arbitrary and capricious to apply the regulatory arbitrage concerns to a relative use calculation, any more than it is to apply it to a reciprocal compensation calculation.

In a nutshell, CPUC's policy rationales conform to *FCC Remand Order. FCC Remand Order* controls the outcome of my decision. *US West,* 57 F.Supp.2d at 1117–18 (explaining that the *FCC's Local Competition Order* is binding on state agencies and the district court). Consequently, CPUC's determination was not arbitrary and capricious.

For the reasons set forth above, neither 47 C.F.R. § 51.703(b) nor 47 C.F.R. § 51.709(b) demonstrate that CPUC erred in its determination. Further, CPUC's determination was not arbitrary and capricious. Qwest and CPUC's motions for summary judgment, therefore, are granted as to Issue 6 in the proceedings below, and Level 3's motion for summary judgment is denied as to Issue 6 in the proceeding below.

### 3. Conclusions

Based on the foregoing it is therefore

ORDERED as follows:

1. Qwest's Motion to Substitute Attorney (# 49) is GRANTED.

2. Qwest's Motion to for Summary Judgment (# 37–1) is GRANTED as to Issue 6 (relative use), and is DENIED as moot as to Issue 2 (reciprocal compensation).

3. CPUC's Motion for Summary Judgment (# 35–1) is GRANTED as to Issue 6 (relative use), and is DENIED as moot as to Issue 2 (reciprocal compensation).

4. Level 3's Motion for Summary Judgment (# 33–1) is DENIED as to Issue 6 (relative use), and is DENIED as moot as to Issue 2 (reciprocal compensation).

5. The clerk shall forthwith enter final judgment in favor of defendants and against plaintiff, dismissing the complaint with prejudice. Defendants may recover their costs by filing a bill of costs within eleven days of today's date.